**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**

| | |
|---|---|
| **United States of America,** | **Case No. 1:25-cr-00481-PAB** |
| **Plaintiff,** | |
| **-vs-** | |
| | **JUDGE PAMELA A. BARKER** |
| **Errol King,** | |
| **Defendant.** | **MEMORANDUM OPINION & ORDER** |

Currently pending before the Court is Defendant Errol King's Motion to Suppress (the "Motion"). (Doc. No. 20.)  The United States of America filed an Opposition to the Motion on July 21, 2026.  (Doc. No. 21.)   King did not file a Reply.  For the following reasons, the Motion (Doc. No. 20) is GRANTED in part and DENIED in part.

## I.      Background

On September 17, 2025, King was indicted by a grand jury on two counts: (1) Possession with Intent to Distribute a Controlled Substance in violation of 21 U.S.C. §§ 841(a) and (b)(1)(C), and (2) Felon in Possession of Firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8).  (Doc. No. 1.) On November 14, 2025, King appeared before Magistrate Judge Greenberg for an arraignment where King pled not guilty.

After several continuances, a final pretrial in this case was set for July 28, 2026.  Two weeks before the final pretrial, on July 14, 2026, King filed his Motion.  (Doc. No. 20.)   On July 21, 2026, the United States filed its Opposition.  On July 28, 2026, the Court converted the final pretrial to a hearing on the Motion.  After the hearing, the Court entered the following minutes:

Evidentiary hearing as to Errol King's (1) Motion to Suppress (Doc. No. 20) held

on 7/28/2026. Defendant appeared and was represented by Attorney Marisa L. Serrat. Assistant U.S. Attorney Scott C. Zarzycki appeared on behalf of the government. Testimony taken: Detective Matthew Randolph and Deputy Jim DeCredico. Government's exhibits presented during the hearing were admitted, without objection. The Court will take the motion under advisement. The Court advised Defendant of his speedy trial rights. Defendant waived his right to a speedy trial. Order to follow. Defendant remanded to the custody of the US Marshal.

Accordingly, King's Motion is ripe for the Court's review.

## II.      Evidence presented at the hearing

At the hearing, the United States presented two witnesses: Matthew Randolph and James DeCredico.  Randolph is a Detective with the Cleveland Police assigned to the Second District Vice Unit.  DeCredico is a Detective with the Cuyahoga County Sheriff's Department.

### A.      Randolph begins his surveillance of King

Randolph testified that within the Second District there are certain areas known to be associated with drug trafficking, including the area of W. 25th and Walton Avenue.  He testified that this area has a lot of drug activity and drug overdoses, and that the Cleveland Police constantly receives complaints from business owners in the areas concerning panhandlers, thefts, robberies, and drug users.

Randolph testified that from April 2021 to the present, there were ongoing drug sales and drug users in that area at all hours of the day.  Randolph would conduct daily surveillance in that area.  As part of that surveillance, Randolph testified that he observed King conducting, which he believed to be, hand-to-hand drug transactions and identified a vehicle involved with the drug transactions.

Through June 2025, Randolph continued surveilling King and observed that King would, on numerous occasions, wear a crossbody bag (i.e. a "fanny pack").  Randolph testified that on numerous occasions he observed drug users that he was either familiar with in the area or individuals that exhibited physical signs of drug dependency walk up to King and hand him U.S. currency.  King

would then reach into his pants pocket, pull out a cellophane baggie, pick a small item out of that, provide that item to the person, and he would place U.S. currency into the fanny pack.  Randolph also observed King pull out a bag, of what he suspected were narcotics, from the fanny pack.  Between June 15 and June 22, Randolph observed these transactions on multiple days.

Randolph then testified that during his surveillance, he observed and learned that King would park his vehicle away from the area where King appeared to him to be selling drugs.  Based on Randolph's experience, this is a way for drug dealers to separate themselves from the vehicle and from being identified.

Randolph never conducted a controlled buy and did not take any pictures of King or others interacting with King during his surveillance.  But at some point, during his surveillance, DeCredico called Randolph to inform him that he had received information from Family Dollar that King was involved in drug activity in the area.

### B.      King is arrested on July 3, 2025

On July 3, 2025, Randolph observed King purportedly selling drugs again—somebody would walk up to him and exchange U.S. currency, and King would hand them a cellphone baggie from his fanny pack.  That same day, Randolph contacted DeCredico to see if he had a crew that was available to come out and to do a "takedown" of King.

The Cuyahoga County Sheriff's Department then conducted the takedown.  When the deputies approached King, there was some miscommunication.  One deputy was supposed to drive in from the south but instead came from the north.  Randolph and DeCredico believe that King or his spotters saw the deputy sheriff's vehicle go by and alerted King of law enforcement's presence, which caused him to walk towards the Rite Shop Food Mart on the corner of West 25th and Walton.

3

Randolph observed King go into the Rite Shop while wearing the fanny pack.  Randolph testified that he was walking and that he was not doing "anything frantic" or "anything absurd."

At the hearing, a video of King entering the store was introduced.  The video shows King entering the store with the fanny pack on.  The video shows King walk around the shelves second closest to the door, turn around into the next row of shelves, and place the fanny pack behind some merchandise on the lowest level of the shelves.  The deputies, one of whom was DeCredico, then encountered King after he hidden the fanny pack, placed him in handcuffs, and escorted him out of the store.  King was then moved into the parking lot and placed in a police cruiser.

Randolph observed that King no longer had the fanny pack on and alerted the deputies of this fact.  The deputies then searched the store.  One of these deputies was Detective Jake Engelhart.  Engelhart's bodycam footage was introduced at the hearing.  The footage shows Engelhart recovering the fanny pack.  Engelhart then feels the fanny pack and communicates to the other deputies that he could feel a firearm in the fanny pack.  Based on this, Engelhart searched the fanny pack, and discovered a firearm and drugs.  Approximately three minutes passed between King being placed in handcuffs in the Rite Shop and law enforcement searching the contents of the fanny pack.

King was then placed under arrest.[1]

### C.     Law enforcement then searches King's vehicle

After discovering the drugs in King's fanny pack, DeCredico then deployed K-9 Felix to sniff around King's parked vehicle.  DeCredico testified as to how K-9 Felix alerts on a vehicle:

> His trained final alert is to sit. Sometimes he will lay completely down depending on where the odor is coming from. And then honestly, if weather permits or the blacktop's hot or it's snowy, icy conditions, he will body lock out like a bird dog for obvious reasons of him not wanting to sit his butt down on certain areas. So if

---

[1] DeCredico testified, however, that he personally believed King was placed under arrest when he was placed in handcuffs in the store.

4

there's a curb or a wall there that he can't physically do his final trained behavior, I annotated in my training with him what I articulate as an alert.

Engelhart's bodycam footage shows K-9 Felix sniffing King's vehicle from the driver's side.  The footage does not show K-9 Felix sniffing the vehicle from the passenger's side of the vehicle.  After watching the footage, DeCredico testified:

> Just watching this brief footage from this angle, not having any audio and not watching my body camera, it appears he had numerous behavior changes to attempt to source odor where he climbed high on his own, and then after climbing high he went underneath the car. It's not typical for these dogs to go underneath vehicles unless there's an odor that they're trying to source. It appeared that he had a few head snaps, which is typical with sourcing odor. It would be the same as if our personal dogs, if we had personal dogs for explanation of this, while you're walking your dog, your dog smells urine to mark that tree. He goes past it, catches the odor, comes back. That would in our world be called as a head snap. They're locking in the bracket of where odor is sourced from.

He testified, however, that he did not observe K-9 Felix do a "final alert" on the driver's side.  But DeCredico's report of King's arrest indicates that "K9 [Felix] alerted to [King's] vehicle."

After searching the vehicle, the deputies discovered numerous baggies of marijuana, a digital scale, a box of latex gloves and a box of sandwich bags.

### III.    The parties' arguments

In his Motion, King argues that "[l]aw enforcement lacked probable cause to arrest Mr. King, and the searches that followed violated the Fourth Amendment."  (Doc. No. 20, PageID #84.)  King asserts that law enforcement "did not use a confidential informant or undercover officer to conduct any purchases from Mr. King on July 3, 2025," that "[n]o drugs were recovered prior to the unlawful arrest of Mr. King," that "[n]o controlled substances were recovered from either of the two unidentified individuals whom Detective Randolph claimed participated in the alleged transactions," that the officers did not "stop, identify, or interview those individuals before arresting Mr. King," and

that "Randolph never claimed to have observed narcotics." (*Id.* at PageID #87.)  King then argues that "[t]he Officers' actions here of immediately arresting Mr. King inside of the Rite Ship Food Mart extended beyond that of a Terry stop" and that "there were insufficient facts known to the arresting officers at the time they arrested Mr. King" to support probable cause.  (*Id.* at PageID #87–89)  King then argues that he retained "a privacy interest in the bag" and that "the government cannot establish that the defendant's voluntary words or conduct would lead a reasonable person in the searching officer's position to believe that the defendant relinquished his property interests in the item searched or seized." (*Id.* at PageID #89–90.)  King's final argument is that law enforcement lacked reasonable suspicion and probable cause to search his vehicle. (*Id.* at PageID #91.)

The United States responds in its Opposition that "King exhibited many of the suspicious behaviors that sufficiently justify reasonable suspicion."  (Doc. No 21, PageID #98.)  The United States points to following:  (i) "the officers received a tip that drug trafficking was occurring in connection to a car linked to King," (ii) "[t]hen over a period of weeks and the day he was stopped, officers observed King engaging in hand-to-hand transactions consistent with drug trafficking, relying on their experience," (iii) "King was in a high crime area which contributed to the calculation of reasonable suspicion, (iv),  "King also appeared to evade police when they were approaching by entering the Rite Aid," and (v) "King ditch[ed] the fanny-pack which officers observed him using in connection with these transactions." (*Id.*)  The United States then argues that King's detention did not exceed a *Terry* stop because "the time King was placed in handcuffs to when the bag was found, roughly 90 seconds had passed" and "[a]nother twenty seconds passed before the officer notified the other officers that he felt a gun in the bag." (*Id.* at PageID #101.)  The United States next argues that "King abandoned the fanny pack and no longer had a reasonable expectation of privacy when he

6

placed it behind some items on the shelves of the Rite Aid."[2]  (*Id.* at PageID #103.)  The United States' last argument is that law enforcement had reasonable suspicion to have K-9 Felix sniff King's vehicle and that "[b]ecause the K9 alerted, the officers therefore had probable cause to enter and search the vehicle for evidence of drug trafficking."  (Doc. No. 21, PageID #104–05.)

## IV.    Analysis

Based on the parties' arguments in their briefing, and at the hearing, the Court finds and concludes as follows: (1) King's detention at the Rite Shop was supported by reasonable suspicion, (2) King abandoned the fanny pack, which permitted law enforcement to conduct a warrantless search of its contents, (3) law enforcement then had probable cause to arrest him based on the contents of the fanny pack, (4) law enforcement had reasonable suspicion to conduct a dog sniff of King's vehicle, and (5) law enforcement lacked probable cause to search King's vehicle.  The Court's conclusions are explained in greater detail below.

### A.    King's stop was supported by reasonable suspicion

The Fourth Amendment provides "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  It is hornbook law, however, that an officer may briefly stop and detain an individual for investigative purposes without obtaining a warrant.  *Terry v. Ohio*, 392 U.S. 1, 27 (1968); *United States v. Bailey*, 302 F.3d 652, 658 (6th Cir. 2002).  "An officer may conduct an investigative stop only if he has 'reasonable, articulable suspicion that the person has been, is, or is about to be engaged in criminal activity.'"  *United States*

---

[2] The United States alternatively argues that the plain view doctrine permitted the officers to search the fanny pack because Engelhart felt a firearm.  (*Id.* at PageID #103–04.)

*v. Jones*, 673 F.3d 497, 502 (6th Cir. 2012) (quoting *United States v. Place*, 462 U.S. 696, 702 (1983)). "Reasonable suspicion is based on the totality of the circumstances presented to the officer." *Id.* (citing *United States v. Sokolow*, 490 U.S. 1, 8 (1989)). Factors supporting reasonable suspicion can include a suspect's "presence in a high crime area," a suspect's "unprovoked flight upon noticing the police" and "a suspect's action in dropping an unidentified object." *Id.* A full arrest occurs when "a reasonable person in the defendant's position [would] have felt that he was under arrest or was otherwise deprived of his freedom of action in any significant way." *Sutton v. Metro. Gov't of Nashville & Davidson Cnty.*, 700 F.3d 865, 874 (6th Cir. 2012) (quoting *United States v. Richardson*, 949 F.2d 851, 857 (6th Cir. 1991)).

In *Jones*, the Sixth Circuit concluded that officers had reasonable suspicion to conduct a *Terry* stop. *Id.* at 503. It reached this conclusion because the officer knew that (1) the defendant "was in a high-crime area, particularly known for drug activity," (2) the officer observed the defendant "enagage[] in an apparent hand-to-hand transaction, (3) the defendants ran when the officer excited his car, and (4) as the defendant fled, "he threw several items to the ground." *Id.* Like in *Jones*, Randolph's testimony here establishes that King was in a high crime-area that is known for drug activity. Randolph observed King engage in hand-to-hand drug transactions and on the day of his arrest saw him with his fanny pack. When King saw the deputies approaching him or his spotters saw them and alerted King, he fled to the Rite Shop. And when he was fleeing, he hid his fanny pack in the Rite Shop. Based on the totality of the circumstances, the Court finds that these facts are sufficient to find that the deputies had reasonable suspicion to detain King under *Terry*.

And King's brief detention did not escalate to a full arrest prior to law enforcement searching the fanny pack. "In assessing whether a detention is too long in duration to be justified as an

8

investigative stop" courts "examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant."  *United States v. Sharpe*, 470 U.S. 675, 686 (1985).  The Sixth Circuit has identified several factors to consider when making this assessment: "the length of the detention, the manner in which it is conducted, and the degree of force used in determining whether an investigative stop is reasonably related to the basis for the original intrusion."  *Dorsey v. Barber*, 517 F.3d 389, 399 (6th Cir 2008) (citing *Smoak v. Hall*, 460 F.3d 768, 781 (6th Cir. 2006)).

Here, King was placed in handcuffs and moved from the Rite Shop to the parking lot and placed in a police cruiser.  While King was placed in handcuffs, only three minutes passed between King being placed in handcuffs in the Rite Shop and law enforcement searching the fanny pack to discover the firearm and the drugs.  Indeed, upon King's initial detention, law enforcement diligently searched for the fanny pack and found it approximately 90 seconds later.  The Court accordingly finds that King's brief detention in the police cruiser did not transform the *Terry* stop into a full arrest.  *United States v. Wilson*, 199 F. App'x 495, 497 (6th Cir. 2006) (fifteen-minute detention while officers waited for a drug dog did not exceed the bounds of *Terry*); *Houston v. Doe*, 174 F.3d 809, 815 (6th Cir. 1999) ("Further, detention in a police cruiser does not automatically transform a *Terry* stop into an arrest").

And once law enforcement lawfully searched the fanny pack, as explained in the next section, they had sufficient probable cause to arrest King.  The Court accordingly rejects King's argument that he was unlawfully arrested.

**B.      King abandoned the fanny pack when he placed it on the shelf**

"[A] person who voluntarily abandons property in the absence of an unconstitutional seizure

9

has no legitimate expectation of privacy in it, and therefore its search or seizure does not violate his Fourth Amendment rights." *United States v. Eastman*, 645 F. App'x 476, 479 (6th Cir. 2016) (citing *United States v. Robinson*, 390 F.3d 853, 873–74 (6th Cir. 2004); *United States v. Frazier*, 936 F.3d 262, 265 (6th Cir. 1991)).  "Abandonment is primarily a question of intent, and intent my be inferred from words, acts, and other objective facts." *United States v. Dilliard*, 78 F. App'x 505, 510 (6th Cir. 2003) (citing *Unites States v. Colbert*, 474 F.2d 174, 176 (5th Cir. 1973)).  Courts within this Circuit have found that when a defendant abandons an item when he discards it while evading law enforcement.  *Id.* at 511 (holding defendant abandoned property when he "was not attempting to secrete the container in a place where he had an expectation of privacy, but rather discarded the item in his attempt to avoid arrest"); *United States v. Hatfield*, No. 6:25-CR-83-REW-HAI, 2026 U.S. Dist. LEXIS 25, at *18 (E.D. Ky. Jan. 2, 2026) (finding defendant abandoned a backpack when he discarded it in a public field while running from law enforcement); *United States v. Baker*, No 1:09-CR-095, 2010 U.S. Dist. LEXIS 81457, at *12 (S.D. Ohio July 1, 2010) ("Baker's act of discarding his weapon while running down a public street amounts to abandonment").

The Court reaches the same conclusion here.  Upon noticing law enforcement, King entered the Rite Shop.  Before law enforcement detained him, King placed the fanny pack on one of the shelves.  Based on King's attempt to hide the fanny packs, a reasonable person in the deputies' position could conclude that King did so avoid arrest.  And King certainly did not retain a reasonable expectation of privacy in the fanny pack by leaving it in a place readily accessible to the public. *Maryland v. Macon*, 472 U.S. 463, 469 (1985) ("Here, respondent did not have any reasonable expectation of privacy in areas of the store where the public was invited to enter and to transact business"); *United States v. Lang*, 717 F. App'x 523, 541 (6th Cir. 2017) ("a defendant has no

10

reasonable expectation of privacy in places of a commercial building where the public is invited to transact business"); *United States v. Gonzalez*, No. 3:24-CR-122-TAV-JEM, 2025 U.S. Dist. LEXIS 158622, at *23 (E.D. Tenn. Aug. 15, 2025) ("the Court nonetheless finds that defendant, in discarding the backpack in a public space during his flight with law enforcement, abandoned the backpack and relinquished any legitimate expectation of privacy he may have had in it"); *Baker*, 2010 U.S. Dist. LEXIS 81457 at *12 ("Finally, the fact that the gun ultimately landed in a gated garage does not alter this Court's analysis as Baker suggests it should. While the parking garage where Baker's gun landed was not exactly a public place, Baker had no privacy interest in the garage").  For these reasons, the Court finds that King abandoned the fanny pack, which allowed law enforcement to search it without a warrant.

### C.	Law enforcement lacked probable cause to search King's vehicle

The Court first rejects King's proposition that law enforcement lacked reasonable suspicion to perform a dog sniff.  First, "officers are free to perform dog sniffs on unoccupied parked cars without reasonable suspicion." *United States v. Dyson*, 639 F.3d 230, 232 (6th Cir. 2011).  Thus, "reasonable suspicion was not required because [King's] vehicle was unoccupied and parked in a publicly accessible [street] at the time the dog sniff was performed." *Id.*  Second, even if reasonable suspicion was required, the record supports the sniff.  Randolph's investigation tied King to the vehicle, and the sniff occurred after drugs were found in King's fanny pack.

But the Court agrees with King that law enforcement lacked probable cause to search his vehicle.  "Officers may search a car without a warrant if they have probable cause to believe it contains evidence of criminality" and "a K9's positive alert presumptively supplies probable cause to search a vehicle so long as the government provides evidence that the K9 reliably identifies

11

contraband in controlled settings." *United States v. Saine*, 162 F.4th 804 (6th Cir. Dec. 22, 2025) (citing *Florida v Harris*, 568 U.S. 237, 248 (2013); *Hernandez v. Boles*, 949 F.3d 251, 259 (6th Cir. 2020)).  As explained by the Supreme Court, the relevant question "is whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime." *Harris*, 568 U.S. at 248.  "A sniff is up to snuff when it meets that test." *Id.*  "A defendant may challenge the results of a given sniff, including by questioning the dog's training or the K9 handler's performance." *United States v. Copeland*, No. 1:25-cv-00025, 2026 U.S. Dist. LEXIS 178749, at *23 (N.D. Ohio Aug. 11, 2026) (citing *Harris*, 568 U.S. at 247).

King's sole challenge to the sniff is the lack of evidence of a final alert.[3]  While DeCredico's report indicates that "K9 [Felix] alerted to [King's] vehicle," no testimony was developed at the hearing that there was indeed a final alert.  DeCredico testified generally that he could not recall whether there was a final alert.[4]  Engelhart's body cam footage only shows the sniff on the driver's side of King's vehicle.  The video does not appear to show a final alert on the driver's side, and DeCredico testified that there was no final alert on the driver's side.  Because DeCredico's report is inadmissible, see Fed. R. Evid. 803(8)(ii), there is simply no evidence that there was a final alert on the passenger side.  The Court therefore finds that there is insufficient evidence to establish that a reasonably prudent person would think that a search would reveal contraband or evidence of a crime. *Harris*, 568 U.S. at 248.  For all these reasons, the Court finds that law enforcement lacked probable

---

[3] In King's Motion, he asserts that he is challenging "K9 Felix's certification, training records, field performance, maintenance records, and deployment history," but his counsel did not question DeCredico on these issues.

[4] The United States could have used the report to attempt to refresh DeCredico's recollection on this issue, but it did not do so at the hearing.

12

cause to search King's vehicle.[5]

## V.    Conclusion

For the reasons set forth herein, the Motion (Doc. No. 20) is GRANTED in part and DENIED in part.

**IT IS SO ORDERED.**

|  |  |
|---|---|
|  | _s/Pamela A. Barker_ |
|  | PAMELA A. BARKER |
| Date:  August 13, 2026 | U. S. DISTRICT JUDGE |

---

[5] In any event, King's counsel conceded at the hearing that "nothing charged in the indictment was recovered from the search of the vehicle."  Even if law enforcement had probable cause, such a finding would not alter the course of this case.

13